# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-297 (TJK)** |
| **v.** | : | |
| | : | |
| **JOSHUA KNOWLES,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Joshua Knowles to 9 months of incarceration. The government also requests that this Court impose one year of supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.       Introduction

Joshua Knowles, the owner of a swimming pool maintenance company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Knowles pleaded guilty to violating 18 U.S.C. § 1752(a)(2). The government's recommendation is supported by Knowles' conduct, which includes: marching to the Capitol building with full knowledge of the ensuing chaos; sending a text message to his friend that there was supposed to be a "terrorist attack" ongoing at the Capitol building; joining the mob in an effort to "storm the capital building"; helping rioters to scale a wall to reach an entry point into the building; entering the Capitol through the Senate Wing Door despite receiving numerous text messages indicating the potential for violence upon entry; watching the mob swarm and attack several police officers and, moments later, attempting to breach the North Door of the Capitol building; and defiantly remaining on Capitol grounds until he was arrested. Tellingly, Knowles stormed the Capitol building because his goal was to "get into the Senate floor."  And finally, to date, Knowles has expressed no remorse for his conduct on and participation in the January 6 Capitol riot.

The Court must also consider that Knowles' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Knowles' crime support a sentence of 9 months of incarceration in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 36 at 1-3.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

### *Knowles' Role in the January 6, 2021 Attack on the Capitol*

Knowles traveled to Washington, D.C. from Gilbert, Arizona to attend the "Stop the Steal" rally on January 6, 2021. On that day, Knowles wore a red, white, and blue Trump 2020 beanie, a black and blue plaid patterned flannel shirt, a blue and white neck gator, a black sweatshirt, black rimmed glasses, black pants, and red shoes. At times, he wore a black cape with blue and orange coloring, and he carried a white pole with a flag attached.



*Image 1: Photo taken on January 6 showing Knowles (yellow circle)*

On the morning of January 6, 2021, Knowles attended the "Stop the Steal" rally. While there, he watched and recorded several videos of the speakers, including the former president. Knowles sent videos to contacts in his phone and exclaimed, "It's wild." A contact in Knowles' phone sent him a text message that said, "Save America !" and Knowles responded, "Trying to."

Later during the rally, Knowles received and read a text message that said, "HAPPENING NOW Congress is voting to certify, or OBJECT TO, the Election results. Pres Trump needs YOU to STAND WITH HIM! 1000% IMPACT!" Not long after, Knowles joined the crowd and marched to the Capitol.

Knowles sent a text message to contacts in his phone that said, "Walking there now with a million people." He followed up with another text, at 11:59 a.m., that said, "Supposed to be a terrorist attack at the capital building." Knowles continued to march towards the Capitol grounds, and could see emergency vehicles and police officers. Rather than leave, he continued forward and sent a text message that said, "I guess we are trying to storm the capital building."

At 12:14 p.m., a contact sent a photo to Knowles of a news broadcast with the headline, "U.S. Capitol on Lockdown as Protests Erupt":



*Image 2: Photo sent to Knowles at 12:14 p.m.*

Another contact sent Knowles a text message in a group chat that said, "House and senate are both in shelter in place orders lol goodness." Another contact followed up in that same group chat with, "Now there is people actually inside the capital." Knowles continued marching to the Capitol building and responded: "Yeah I just heard. Heading there now."

After making it onto Capitol grounds, Knowles made his way through thousands of rioters on the West Front. He ascended to the Lower West Terrace and, once there, he assisted rioters scaling a wall to gain access to the landing near entrances to the building.



*Image 3: Screenshot of video showing Knowles (yellow circle) assisting rioters scaling the wall*

Around this time, a family member sent Knowles a text messages that said, "Be careful at the capitol, patriots are inside the capitol trying to get into the dome area and cops are armed and pointing live rounds on the other side of the door." A different family member sent Knowles a text message asking if he was okay, and followed up with another message that said, "i heard two people got shot for going in the capital."

Even knowing the likelihood of violence, Knowles entered the Capitol building through the Senate Wing Door at 3:13 p.m. As he entered, alarms blared, broken glass was scattered on the floor, and rioters chanted and yelled as they flooded into the building.



*Image 4: Screenshot of Capitol surveillance footage showing Knowles (yellow circle)
entering the Capitol building*

After remaining in the Senate Wing Door foyer for a few minutes, Knowles proceeded

down a hallway to the Crypt where he used his cell phone to record the chaos around him.



*Image 5: Screenshot of video footage showing Knowles (yellow circle) marching through the Crypt*

Still wielding the pole with a flag attached, Knowles made it back to the Senate Wing

Doors. As police officers began to gain some control over the area, Knowles exited the building at

3:22 p.m. through the same door that he entered.



*Image 6: Screenshot of Capitol surveillance footage showing Knowles (yellow circle) moving to exit the building*

Knowles remained on Capitol grounds. He moved from the Northwest Courtyard to the North side of the building and joined the mob massed outside the North Door. Rioters threw objects against the door and attempted to forcibly enter. Police officers in the crowd were swarmed by rioters.

Knowles watched as the officers were assaulted by rioters.



*Image 7: Screenshot of video footage showing police officers (red arrow) get swarmed and Knowles (yellow circle) watching and trailing nearby*

The officers eventually made it out of the crowd and retreated to the nearby doors. Knowles followed the officers up the stairs and approached the North Door.



*Image 8: Screenshot of video footage showing officers retreating from crowd and Knowles (yellow circle) nearing the North door as officers (red arrow) attempted to retreat to the door*

As the crowd chanted, "Fuck the blue!" Knowles made his way to the front of the crowd of rioters and approached the North Door.



*Image 9: Screenshot of video footage showing Knowles (yellow circle) approaching the North Door where officers had retreated*

The officers sprayed chemical irritant at the rioters in attempt to disperse the crowd away from the door. When the air cleared and officers retreated behind a second set of doors, Knowles and other rioters approached the doors and attempted to enter the building.



*Image 10: Screenshot of video footage showing Knowles (yellow circle) approaching the North Door as rioters attempted to break in*

Police officers again sprayed chemical irritant at the rioters to disperse the crowd. After Knowles was sprayed, he moved away from the door.  But once the air cleared, Knowles again approached the door and held his hand in the air facing towards the officers as other rioters continued to attempt to breach the door.



*Image 11: Screenshot of video footage showing Knowles (yellow square) with his arm in the air towards officers guarding the door*

A fire extinguisher was deployed. Only then did Knowles retreat from the door.



*Image 12: Screenshot of video footage showing Knowles (yellow circle) retreating from the North Door after officers deployed smoke*

Officers eventually gained control of the North terrace and attempted to move the rioters off the Capitol grounds. The officers repeatedly instructed the rioters to "BACK UP!" Knowles remained at the front of the police line, trailing behind other rioters, disobeying the officers' commands and leaving only when physically pushed out by the officer line.





*Images 13 & 14: Screenshots of video footage showing officers corralling rioters off the North terrace, and Knowles (yellow circle) as one of the last of the group of rioters to comply with directives to leave*

A contact from Knowles phone sent a text message, "DC mayor has a 6pm curfew." At 5:03 p.m., Knowles responded, "Yeah dc police shot and killed 2 people possibly a third person. Shit was old." Another person texted Knowles about the curfew: "Don't stay out past curfew if only a few hundred people are outside. The last died who the cops shot inside the capitol so they may keep doing it."

Even after police officers cleared the areas near the building and the city-wide curfew went into effect, Knowles remained near the Capitol. Metropolitan Police Department ("MPD") officers verbally warned Knowles and other rioters that they were violating the curfew and needed to disperse. Meanwhile, the United States Capitol Police broadcasted on a loop numerous warnings that the Capitol Grounds were closed to unauthorized persons. The final warning stated: "This is your last and final warning. You're in violation of a curfew on the 100 Block of Pennsylvania Avenue NW. You are subject to immediate arrest if you do not disperse."



*Image 17: Screenshot of video footage showing Knowles (yellow circle) and others refusing to disperse, violating the city-wide curfew*

Nevertheless, Knowles and a small group of other rioters refused to leave. MPD officers arrested Knowles.

After Knowles left Capitol grounds, he bragged about his participation in the riot. He sent text messages saying things like:

- "[B]eat the shit out of 3 tough guy cops after they shot and kill[ed] the 16 year old girl."
- "Sh[i]t got wild"
- "I got Tear gassed pepper sprayed billy clubbed. Flash bang blew up at my feet."
- "Wasn't a riot but we were trying to get into the senate floor."
- "Just left the capital. Got tear gassed 3 times and flash banged," and "it's freaking crazy out here right now."

### *The Charges and Plea Agreement*

On August 15, 2022, the United States charged Knowles by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).   On March 26, 2024, pursuant to a plea agreement, Knowles pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2)

– Disorderly and Disruptive Conduct in the Capitol Building or Grounds. By plea agreement, Knowles agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Knowles now faces a sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Knowles faces up to one year of imprisonment and a fine of up to $20,000. Knowles must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR, ECF No. 39 at ¶¶ 64-73, consistent with the plea agreement, ECF No. 35 at 2-3.

| 18 U.S.C. § 1752(a)(2) | | |
|---|---|---|
| U.S.S.G.  § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G.  § 3E1.1(a) | Acceptance of Responsibility | - 2 |

**Total Adjusted Offense Level                            8**

Section 4C1.1 does not apply in this case because Knowles has 4 criminal history points. *See* PSR ¶ 77.  *See* U.S.S.G. § 4C1.1(a) (two-level downward adjustment of the offense level if

"the defendant did not receive any criminal history points from Chapter Four, Part A.").

The U.S. Probation Office calculated Knowles' criminal history as a category III. PSR at ¶ 77. Accordingly, the U.S. Probation Office calculated Knowles's total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 6-12 months. PSR at ¶ 137. while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide a benchmark.

**Sentencing Factors Under 18 U.S.C. § 3553(a**

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 8 months of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Knowles' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Knowles, the absence of violent or destructive acts is not a mitigating factor. Had Knowles engaged in such conduct, he would have faced additional criminal charges.

In this case, Knowles entered the Capitol building despite receiving numerous text messages from his family and friends indicating the potential for violence, knowing that lawmakers were in the building in hiding, and with the purpose of storming the building to reach

14

the senate floor. After his first breach of the building, Knowles watched as rioters attacked police officers. Moments later, Knowles attempted to breach the North Door and reenter the building. After police officers gained control of the North terrace, Knowles disobeyed police officers' commands to "back up!" And Knowles remained in the area for hours—so long, in fact, that he was eventually arrested for defiantly refusing to comply with a curfew order. Knowles' participation in the riot was active and prolonged. It was because of rioters like Knowles that lawmakers were under emergency evacuation order for many hours. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration this matter.

### B.  Knowles' History and Characteristics

As set forth in the PSR, Knowles' criminal history is extensive, *see* PSR ¶¶ 75-86, and he has demonstrated a repeated disregard for the law. Knowles' criminal history includes Solicitation to Commit Sale or Transportation of Dangerous Drug (felony, 2009); Disorderly Conduct (domestic violence, 2022); vehicle registration violation (2011); Exceeding 85 Miles Per Hour (2011); two counts of Reckless Driving (2012); Driving with a Suspended/Revoked License (2013); Reckless Driving and Failure to Stop upon Peace (2017); Off-Highway Vehicle without User Indicia (2020); and Shoplifting (2005). *See* PSR ¶¶ 75-86.

Most recently, Knowles was convicted in January 2022 of Disorderly Conduct – Fighting (domestic violence) after threatening his wife with a gun. *See* PSR ¶ 76. After taking his wife's cell phone, Knowles came out of his residence with a handgun and told his wife "you're gonna disappear if you don't leave." He later said that "if you call the police you're gonna watch a shootout" and "shit is about to go down." Knowles pushed his wife several times and verbally threatened her, including telling her that he hoped she got into a car accident and died. *Id.*

In 2009, Knowles was convicted of solicitation to commit sale or transportation of dangerous drugs. PSR ¶ 75. Knowles attempted to sell thousands of pills to an undercover agent and admitted he had previously purchased as many as 100,000 pills at a time in Mexico. As a result of this conviction, Knowles served 18 months of incarceration.

Knowles' criminal history demonstrates a longstanding lack of respect for the law and the need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*: The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*: As discussed above, Knowles' criminal history, which reveals a clear pattern of disrespect for the law, coupled with his intent to "storm" the Capitol in order to reach the Senate floor, warrant specific deterrence. Knowles did not accept the results of the 2020 presidential election. Rather than voice his concerns peacefully, on January 6, he marched to the Capitol knowing that a riot was underway and boasting that there was supposed to be a "terrorist attack" at the Capitol, and he joined the chaos. After his prolonged participation in the riot, Knowles bragged to his friends that he "beat the shit out of" three police officers. And to date, Knowles has expressed no remorse for his conduct. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Knowles in a manner sufficient to deter him specifically, and others generally, from going down that road again and engaging in political violence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Knowles based on his own

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Knowles has pleaded guilty to Count Two of the Information, charging him with 18 U.S.C. § 1752(a)(2). This is a Class A misdemeanor. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Harris*, 21-cr-274 (RDM), defendant entered the restricted grounds on the West Front of the Capitol and ascended the Southwest Staircase after witnessing violence between other rioters and police officers. Harris urged other rioters to "move forward" and entered the Capitol building. Once inside the Capitol building, Harris yelled "Whose house? Our house!" and refused police officers' commands to leave the Rotunda and pushed against one officer. Harris remained in the Rotunda until he and other rioters were forced out. After January 6, Harris bragged about his conduct on social media and did not express remorse for his conduct. Judge Moss sentenced Harris to 7 months of incarceration after pleaded guilty to violating 18 U.S.C. § 1752(a)(2).

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Knowles' conduct is substantially similar to that of Harris. For example, both refused police officers' commands to leave the restricted area and left only after officers forced them out. Knowles also refused to comply with repeated commands to disperse after the curfew went into effect, ultimately leading to his arrest. Like Harris, Knowles entered the Capitol building even after witnessing violence against police officers. And although Harris remained inside the Capitol building longer than Knowles, after Knowles exited the building, he later attempted to breach the North Doors and re-enter the Capitol. Additionally, Knowles has a higher criminal history category (III) than Harris (I). Thus, a longer sentence is warranted for Knowles.

In *United States v. Bradshaw*, 23-cr-220 (TJK), the defendant grabbed and held onto an officer's baton and witnessed violence against police while on the West Plaza on January 6. Bradshaw witnessed other rioters breaking windows and then entered the Senate Wing through a broken window and remained in the Capitol building for near an hour. After January 6, Bradshaw continued to deflect blame, minimize, and lie about his own conduct. Bradshaw admitted that he acted with the intent to disrupt the peaceful transfer of power. This Court sentenced him to 4 months' incarceration following a guilty plea to 18 U.S.C. § 1752(a)(2).

Here, like Bradshaw, Knowles' conduct was intended to disrupt the peaceful transfer of power. Knowles' stated purpose when he "storm[ed]" the Capitol was to get to the Senate floor where the certification had been taking place. Whereas Bradshaw was aware of the violence when he witnessed the destruction of windows, Knowles entered the Capitol after several of his family members warned him of the potential for violence and after telling his friends that there was "supposed to be a terrorist attack" at the Capitol building. Although both Bradshaw and Knowles entered the Capitol once, Knowles attempted to re-enter the Capitol building through a second door. Unlike Bradshaw, Knowles joined the mob and trailed officers under siege to the North Door

and attempted to break through the door during a volatile moment as the officers were under attack. And although Bradshaw remained inside the Capitol building for longer than Knowles, Knowles remained on Capitol grounds far longer than Bradshaw. When police officers cleared rioters out of the North Courtyard and repeatedly instructed rioters to "MOVE BACK!" Knowles defiantly refused and stood face-to-face with the officers until he was pushed out by the police line. Then, unlike Bradshaw, Knowles remained on Capitol grounds longer than most others until he was eventually arrested for violating the curfew. And whereas Bradshaw minimized his conduct on January 6, Knowles bragged about his conduct, going as far as stating that he beat up numerous police officers. Moreover, Knowles has a higher criminal history score than Bradshaw, and one that reflects recent, violent conduct. Therefore, a longer sentence of incarceration is warranted for Knowles.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Knowles  must pay $500 in restitution, which reflects in part the role Knowles  played in the riot on January 6.[4] Plea Agreement at ¶ 15. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has since been updated by the Architect of the Capitol, USCP, and MPD.) Knowles' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 161.

## VI.   Fine

Knowles' convictions for violations of 18 U.S.C. § 1752(a)(2) subject him to a statutory maximum fine of $20,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Knowles' income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Knowles' financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 9 months of incarceration, one year of supervised release, 60 months of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Knowles' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      *s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney, MO Bar No. 69601
Capitol Siege Section

Detailed to the U.S. Attorney's Office
District of Columbia
Telephone: (202) 353-0521
Email: Ashley.Akers@usdoj.gov