UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America ) | |
| ) | |
| v.  ) | USDC No. 22-cr-297 (TJK) |
| ) | |
| Joshua Knowles, *defendant*. ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid sentencing on July 25, 2024 at 2 o'clock p.m (EDT) when he appears via video teleconference (VTC) for his hearing. In this pleading, the defendant will offer support for his request that the Court impose a sentence of time served, a period of probation that the Court believes will be sufficient in the circumstances, a fine in lieu of incarceration, and community service, in as many hours as the Court believes will serve as reparations for the defendant's conduct.

1. The history of this case differs from that of many, probably most, January 6 defendants. Unlike those who were arrested in later weeks, months, or even years, after the FBI, was able to identify them as having been present in the U.S. Capitol or on its grounds on that day, the defendant was actually arrested on January 6, 2021. It was for violating the curfew that was established to keep people off the streets at 6 o'clock that evening. He was held overnight at the MPD Central Cellblock, then presented in the D.C. Superior Court the next day. Charged with Unlawful Entry - Public Property, the defendant was released on his own recognizance at

5:50 p.m. the following day and ordered to appear remotely for a status hearing on June 11, 2021.[1]

2. That case remained in the Superior Court, was finally scheduled for trial on October 3, 2022, then dismissed before that date by the U.S. Attorney's Office on Sept. 6, 2022. The dismissal was in favor of prosecuting the defendant for the four federal offenses herein: (a) Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1); (b) Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2); (c) Disruptive Conduct in the Capitol Buildings, in violation of 40 U.S.C. 5104(e)(2)(D), and (d) Demonstrating, Picketing or Parading in a Capitol Building, in violation of 40 U.S.C. 5105(e)(2)(G) ("Demonstrating").

3. The defendant was arrested in Arizona for those offenses when he surrendered to the FBI on August 31, 2022. He was held overnight, and presented at a Rule 5 hearing the next day in the U.S. District Court for Phoenix.[2] A week later, he made his initial appearance in this Court by video on Sept. 8, 2022 following the filing of an Information the day before. United States Magistrate Judge Zia M. Faruqui ordered the defendant's release on personal recognizance, which the government did not oppose. The defendant has remained on release since, in compliance, without incident.

---

[1] D.C. Superior Court Case Search indicates he was charged with a single offense, Unlawful Entry, likely under D.C. Code 22-§3302, and released at 5:50:48:15 p.m. on January 7, 2021. The Presentence Report ("PSR") lists this arrest under "Other Criminal Conduct" at page 24, ¶85. It is likely that the defendant would receive two days credit for time spent while detained before his release. It says that he was also charged with Curfew Violation, though the case search docket does not indicate that. It's immaterial, though, because the case was dismissed once the federal case was brought.

[2] A docket entry from the Rule 5 hearing shows that the defendant was in custody: "Appearances: AUSA David Pimsner for the Government, CJA Attorney Zachary Storrs for defendant. **Defendant is present and in custody**. (Recorded by COURTSMART.) Hearing held 3:40 PM to 3:50 PM." (ECF Doc. 8, "Minute Entry before Judge Michael T. Morrissey," page 16) (emphasis added)

4. Following extensive plea negotiations, per a Plea Agreement with the United States, the defendant entered a plea of guilty to Disorderly Conduct, Count II of the Information, under 18 U.S.C. §1752(a)(2)., a Class A misdemeanor which carries a maximum sentence up to one (1) year imprisonment, a fine of up to $100,000, a term of probation not to exceed five (5) years and a $25 special assessment.  As a Class A misdemeanor, the U.S. Sentencing Guidelines apply. (Presentence Investigation Report ("PSR"), page 7, ¶27)  The defendant agreed to pay $500.00 in restitution toward defraying the cost of repairing damage to the U.S. Capitol, repairs which were necessary after the riot.

5. The defendant does not quarrel with the PRS's finding of a sentencing range of 6-12 months incarceration and a fine ranging from $2,000 to $20,000, based on defendant's Criminal History Category III, with a total offense level of 8. (PSR, page 31, ¶137, and pages 32-33, ¶145, respectively.)

6. Defendant and his counsel have lodged no objections to the presentence report.

7. While in the Capitol or on its grounds, the defendant did not commit any violent or destructive act, either to persons or property.  He spent about nine (9) minutes in the Capitol, leaving on his own accord.  During that time, it does not appear that he defied the lawful commands of officers who were beginning "to gain some control over the area." (Govt. Memo, page 6)  After leaving the building it appears he made an effort to go back inside through a different (the North) entrance; officers deployed smoke to keep protestors at bay.  He made no effort to overcome or thwart their efforts.

8. The defendant has a modest criminal record.  He has a felony drug conviction from age 20, and a second conviction at age 32 for disorderly conduct (misdemeanor) noted as "fighting -

domestic violence," a case involving his estranged wife, from whom he is seeking a divorce.[3] (PSR, page 20, ¶75 and page 21, ¶76, respectively).  The two convictions produce the four criminal history points that place him in Category III.The other convictions came starting at age 2, when the defendant was charged with and convicted of Off-Highway Vehicle without User Indicia.  (PSR, page 23,  ¶83).

The defendant submits that his criminal history should be kept in the proper perspective. These offenses come under the heading of "Traffic Infractions," involving the operation, registration and licensing of motor vehicles. These came at ages 21 through 24, and 28.[4] (PSR, pages 23-24, ¶¶78-84)

The defendant asks the Court to place the defendant's record in the proper perspective. The sentencing guidelines themselves exclude certain convictions for traffic infractions. In the defendant's case, there are seven such instances.  The guidelines in effect distinguish *criminal* conduct from *irresponsible* activity.  There *has* to be a reason for that.

Nothing about the defendant's record in this sphere is enviable, and no one who pays for his own car insurance would want it. But the defendant's overall record belies the government's inflated claim that "Knowles' criminal history is extensive," reflecting a "repeated disregard for the law." (Govt. Memo, page 15)

    9.  The defendant's conduct consisted of traveling to Washington to attend the "Stop the Steal" rally.  It's fair to say that he got caught up in the moment with the energy of the crowd,

---

[3] It's important to note that this offense differs from misdemeanor Domestic Violence Assault, a conviction for which makes one ineligible to legally possess a firearm under 18 U.S.C. §922(g)(9). This is moot, though, in the defendant's case, as he has a prior felony drug conviction. Id., §922(g)(1).

[4] The defendant admits to having been a "speed demon" in his younger years, not excusing his behavior as a product of  Arizona's open roads.

joining its march to the Capitol. It would be unfair to say he spearheaded an effort to breach the building and prevent the certification of the election.

10. The Court has seen from other January 6 cases a spectrum of conduct that spans from mild to very serious. The story that emerges of the defendant's conduct is not as an instigator but an observer, not active (though admittedly not passive) but *reactive*, one who received messages from others, responded to them, and was prompted as much by curiosity as political fervor in joining the crowd that went to the Capitol. (PSR, pages 7-10, ¶¶26-40)  Despite the many messages he received and the few he sent out – which included the less-than-sure "I guess we are trying to storm the capital building" – his own messages were meant not to inflame but inform. He did not encourage resistance, much less violence.  He reported what he saw and heard.. The very size of the crowd overawed him: "Walking there now with a million people." (PSR, page 7, ¶31)  When told by a contact that "there is (sic) people actually  inside the capital," the defendant responds, "Yeah I just heard. Heading there now."

11. The messages the government has cited date from January 6 itself.  There's no evidence in the case that the defendant sent messages to others *before* the event, urging them to use whatever means, peaceful or violent, legal or not, to prevent the certification of the election or do harm to those with whom they had their grievance.

12.  Had the defendant been a more involved, engaged activist, one would have expected him to fight with the police, physically oppose their efforts to control the mob, and spend more time inside the Capital than just the nine minutes from start to finish (3:22 to 3:31 p.m.)  he did.  And one would also expect to see him try to overcome – as many protesters and rioters did – the efforts of the police to keep people from entering the building.  It may be that it was the smoke

that officers deployed that kept the defendant from entering the Capital a second time, this time by the North door, but he did not try to force his entry into the building, as many did in the face of crowd control efforts of the police.

13. The defendant disputes several contentions that the government's memorandum places on center stage. The defendant disputes that he was actively helping others scale the wall on the West side of the Capitol that leads to the elevated terrace. (See Govt. Memo, page 4). Rather, he recalls helping at least one protestor simply to keep him from falling to the pavement below. Next, when his text messages use "we" he's referring to the crowd of people at large, rather than to himself, reporting what he sees ("I guess *we* are trying to storm the capital building").

Last, and most important, the defendant denies that he "bragged to his friends that he 'beat the shit out of' three police officers." (Govt. Memo, page 17) The government contends that this supports "specific deterrence' from future criminal acts. The defendant maintains he was reporting what he heard from others, not boasting about his own misdeeds. The defendant's explanation is more than plausible, given the apparently inexhaustible resources that the government has devoted to identifying, apprehending, and convicting January 6 subjects, especially those who assaulted uniformed police officers. This has been, if not the highest priority of the January 6 prosecutions, the first among equals. It defies belief that law enforcement would not have been able to establish that he had beaten even a single one if the defendant were to have beaten as many as three. Given this lead, the bloodhounds[5] at the FBI

---

[5] "Noun: a person keen in pursuit," Webster's Online. Used here admiringly, not disparagingly.

would have ranged over their video and still photos – both CCTV and open source – to find evidence, if such existed, that proved the defendant assaulted an officer.[6]

14. The defendant's entry into the Capitol was not to cause trouble or interfere with the certification of the electoral votes that he knew would take place.  He came to Washington simply to attend a rally and register his peaceful protest.  He, like hundreds of others, entered the Capitol after others had breached it; there's no evidence that his motives were malicious.  Nor that he would have broken windows or attacked police just to get into the building.   He made his entry rather late, more than an hour after the building was first breached.[7]  Many who entered the Capitol mistakenly believed their conduct was protected by the First Amendment, which protects one's rights to freedom of speech and of assembling to register grievances. Where the defendant and so many others were mistaken is that there are limitations on those rights, and in fact the Capitol was closed to the public that day. And  demonstrating, picketing and parading inside the Capital are never legal (*See* 40 U.S.C. §5104(e)(2)(G)).[8]

15. It is true that the defendant remained in the Capital area until after the curfew was put into effort by Mayor Muriel Bowser. But this again may be understood as motivated by his interest as an observer, not an actor.  When stopped by the police, he cooperated fully and offered

---

[6] It's also possible that the defendant's words could be understood as braggadocio ("empty boasting"), untrue but intended to elevate himself to his correspondent..  But the defendant denies that was his intent.

[7] The first breach occurred around 2:10-2:13 p.m.

[8] Contrast the conduct of those who entered the Capitol, albeit when the Capitol was open, to protest the nomination of Brett Kavanaugh to the Supreme Court.  Their stated purpose, planned in advance, was to disrupt the hearings, which they did.  All but one of the protesters were charged under D.C. Code statutes, not federal law. For a discussion of this, see Defendant's Sentencing Memorandum, *United States v. Jenny Cudd,* 21-cr-0068 (TNM), pp. 49-54.  Ms. Cudd made a number of inflammatory statements and 19 minutes inside the Capitol.  She pled guilty to Entering and Remaining on a Restricted Building or Grounds, a Class A misdemeanor and guideline offense in violation of 18 U.S.C. 1752(a)(1), and was sentenced to two (2) months probation, a $5,000.00 fine and $500.00 in restitution.  Defendant acknowledges that the appalling nature of the events of January 6 was different in kind from that involved with  the Kavanaugh hearings.

no resistance.  The video shows the defendant led off quietly – except for the friendly conversation that accompanied their walk to the van — by the officer who made the arrest. Indeed, the officer acted so gentlemanly, he could be mistaken for a personal escort.

16. Under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

17.  The government recommends a sentence of nine months incarceration, one (1) year of supervised release, sixty (60) hours of community service and the payment of $500.00 in restitution, an amount the defendant has already agreed to pay. (Govt. Memo, page 1)

18.  There is a great deal that is admirable about the defendant that obviates the need for further incarceration.  The defendant is self-employed, has for years owned and run his own pool servicing business.  Once the employer of  eleven or twelve workers, he had to close that company because of financial strain his divorce proceedings had caused.  He is now a one-man operation. (PSR, page 28, ¶¶118-119)

The defendant is the father of two young girls, one of whom has experienced debilitating medical problems. It is he who has shouldered the responsibility for her care, and his effort to gain legal and physical custody of his daughters in pending. (PSR, page 25, ¶¶96-97)  He despairs that his wife has neither the interest or ability to provide to the daughter the care the girl needs. (A letter from the defendant's mother, attached as an exhibit, attests to this sorry situation.)  The defendant has considerable financial obligations for both child support ($750/month) and temporary spousal maintenance ($3,000/month).  Much in the past few years has been a struggle for him, given how much others depend on him.

19.  There's no evidence of the defendant fighting the police, destroying property, causing mayhem, or actively seeking to disrupt the lawful certification of electoral votes..  The defendant did nothing of the sort.

20.  The defendant submits that a sentence of time served, in lieu of incarceration, combined with probation and community service, both of suitable length, would satisfy the "need for the sentence…to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  The defendant asks the Court to keep in mind that he has been on release, in either this or the original D.C. Superior Court case, for more than three and a half years.  He has complied with his conditions of release during that time, and shown respect to the Court.[9]  If placed on probation, the defendant would be answerable to the U.S. Probation Office. He would be subject to the jurisdiction of the Court, knowing that any infraction could lead to revocation of probation, with further incarceration to follow.  Such a

---

[9] Following his PSR interview, he reported as required to the U.S. Probation for a drug screen which could not be done since "drug screens are not a condition of his general release." (PSR, page 27, ¶113)  It was frustrating to the defendant, because the defendant, who is self-employed, lost much of a work day appearing for the screen in Phoenix, which required round-trip travel time of roughly 2-½ hours.

term would at the same time provide deterrence specific to the defendant, operating as a disincentive to further criminal behavior.

21. A term of probation would also deter generally. The public is aware, from the comprehensive coverage of the January 6 events and the arrests that followed, of the serious efforts the government has made to prosecute persons involved with the protests and, in many cases, the violence that was perpetrated. These cases, from beginning to end, have been watched very closely by the press where defendants live, so the public will be aware of the defendant's responsibility for his conduct. That can serve to deter others in the future in similar situations.

22. The defendant submits that time served, followed by a period of probation of the Court's choosing, would satisfy the various §3553 factors. The defendant does not concede the need for services (e.g., vocational, substance abuse, help with relocation of residence) that the U.S. Probation Office can provide. However, a period of probation longer than the one year of supervised release available to the in this case could serve the Court's purposes. It would provide the Court with jurisdiction over the defendant for a longer period of time, which in turn would be a disincentive to any further criminal conduct. The Court would have in its hip pocket nearly a year to impose as needed. An affordable fine – say, $1,000 – along with community service hours may also be imposed; the failure to pay or complete his hours could likewise trigger a violation.[10] If the Court is inclined to impose confinement, the defendant requests home confinement so that the defendant may continue to operate his business, support his children, and comply with existing court-ordered financial obligations

---

[10] The Court did just that in *United States v. Nico Clary and Xyan Clary*, 23-cr-432 (RBW). Judge Walton explicitly told the defendants that he was imposing a three-year period of probation in lieu of incarceration (for Entering or Remaining on the Capitol Grounds (40 U.S.C. §1752(a)(1)), like the current Disorderly offense a Class A misdemeanor) supervised release following imprisonment could be no more than one year. To keep the defendants under supervision he decided to forego incarceration in favor of a lengthy probationary period.

For all the reasons noted above, the defendant respectfully requests a sentence of time served, probation, restitution, and community service.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Ashley Akers, Esq., USDOJ-CIV, Commercial Litigation Branch, 1100 L Street, N.W., Washington, D.C. 20530, this 22nd day of July, 2024.

/s/
_____
*Nathan I. Silver, II*